# STATE OF MICHIGAN

# COURT OF APPEALS

---

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellee,

v

WALTER LEE HARDY,

    Defendant-Appellant.

UNPUBLISHED
November 15, 2018

No. 338892
Wayne Circuit Court
LC No. 17-001044-01-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellee,

v

ALTON MARKEITH REGISTER,

    Defendant-Appellant.

No. 339630
Wayne Circuit Court
LC No. 17-001044-02-FC

---

Before: SHAPIRO, P.J., and CAVANAGH and K. F. KELLY, JJ.

PER CURIAM.

Defendants, Walter Lee Hardy ("Hardy") and Alton Markeith Register ("Register"), were tried together on three counts of first-degree criminal sexual conduct ("CSC-1"), MCL 750.520b. Count I charged that defendants engaged in penis to genital penetration with the victim under the following circumstances: (1) during the commission of the felony of kidnapping; and/or (2) while aiding and abetting one another through force or coercion; and/or, (3) the victim sustained personal injury. Count II charged that defendants engaged in penis to genital penetration with the victim as accomplices to one another. Count III charged defendants with CSC-1 under the same circumstances as Count I, only that the penetration was penis to anal opening. A jury convicted both defendants of Counts I and II and acquitted defendants of Count III. Hardy was sentenced as an habitual offender to concurrent terms of 30 to 35 years' imprisonment. Register received concurrent terms of 20 to 25 years' imprisonment. Finding no errors warranting reversal, we affirm.

## I. BASIC FACTS

-1-

This case involves one of the many untested rape kits discovered in 2009. The victim filed a complaint with police in 1997 after she alleged that she was raped by two men she met at a bar in May 1997. The victim heard nothing from police until four or five months before trial when Detective Michael Sabo ("Sabo") came to her house and explained that hers was one of the rape kits that were lost and finally tested. The victim was unable to identify her assailants but DNA from her rape kit matched defendants' DNA. At issue at trial was whether the sex was consensual. Both defendants testified that the victim had sex for money. Defendants were convicted and sentenced as previously stated. We denied their respective motions to remand.[1]

## II. DOCKET NO. 338892

### A. NEWLY DISCOVERED EVIDENCE

Hardy argues that he is entitled to a new trial based on newly discovered evidence. A private investigator had located the victim's friend, Sherita, who was with the victim on the night of the attack. Sherita's version of events of that night differed from the victim's account, especially the victim's claim that she was taken from the bar against her will. Hardy maintains that Sherita was critical to the case, which was a credibility contest between the victim and the defendants.

Our Supreme Court has confirmed that a new trial based on newly discovered evidence involves a consideration of numerous factors:

> For a new trial to be granted on the basis of newly discovered evidence, a defendant must show that: (1) the evidence itself, not merely its materiality, was newly discovered; (2) the newly discovered evidence was not cumulative; (3) the party could not, using reasonable diligence, have discovered and produced the evidence at trial ; and (4) the new evidence makes a different result probable on retrial. [*People v Rao*, 491 Mich 271, 279; 815 NW2d 105 (2012), quoting *People v Cress*, 468 Mich 678, 692; 664 NW2d 174 (2003).]

As to the first factor, "a defendant's awareness of the evidence at the time of trial precludes a finding that the evidence is newly discovered, even if the evidence is claimed to have been 'unavailable' at the time of trial." *Rao*, 491 Mich at 282. The first and third factors are related. The Court explained:

> When evidence is known to the defendant at the time of trial, but is claimed to have been unavailable, the third part of the *Cress* test is necessarily implicated because it requires a showing that the defendant could not, using reasonable diligence, have discovered and produced the evidence at trial. In other words, under *Cress,* when a defendant is *aware* of evidence before trial, he or she is charged with the burden of using *reasonable diligence* to make that evidence available and produce it at trial. A defendant who fails to do so

---

[1] *People v Hardy*, unpublished order of the Court of Appeals, issued April 26, 2018 (Docket No. 338892). *People v Register*, unpublished order of the Court of Appeals, issued June 15, 2017 (Docket No. 339630).

cannot satisfy the first and third parts of the *Cress* test. [*Rao*, 491 Mich at 283 (quotation marks omitted).]

Where, as here, "the evidence is claimed to be unavailable because a witness cannot be found, reasonable diligence may include requesting a continuance or postponement." *Rao*, 491 Mich at 284. "The point is that the law affords a defendant procedural avenues to secure and produce evidence and, under *Cress,* a defendant must employ these avenues in a timely manner because evidence that is known to the defendant, yet not produced until after trial, will not be considered grounds for a new trial." *Id.* at 284. This supports the standard requiring parties to exercise "care, diligence, and vigilance in securing and presenting evidence" and also supports the finality of proceedings. *Id.* "If evidence that was known to the defendant before trial, but not produced until after trial because the defendant failed to exercise reasonable diligence, is deemed newly discovered and sufficient to warrant a new trial, this would contravene both the principles of fairness and finality on which *Cress* is grounded. *Id.* at 284-285.

The rule is more exacting when the newly discovered evidence serves only as impeachment evidence. Historically, such evidence could not form the basis for a new trial. Now, "impeachment evidence may be grounds for a new trial if it satisfies the four-part test set forth in *Cress.* More specifically, newly discovered impeachment evidence satisfies *Cress* when (1) there is an exculpatory connection on a material matter between a witness's testimony at trial and the new evidence and (2) a different result is probable on retrial." *People v Grissom*, 492 Mich 296, 319; 821 NW2d 50 (2012) (footnotes omitted).

Hardy is not entitled to a new trial based on newly discovered evidence because he did not exercise reasonable diligence. Hardy failed to investigate Sherita's whereabouts until his appeal was pending and never moved for a continuance in the trial court. He knew prior to trial that Sherita had been with the victim that night. More importantly, the alleged newly discovered evidence touched only on the victim's credibility and was in no way exculpatory. Sherita never told the investigator anything that would have repudiated the victim's version of what took place. In fact, Hardy's appellate attorney readily admits that Sherita "cannot comment about the alleged rape, as she was not present." Therefore, Sherita's statements would do nothing more than touch upon the victim's overall credibility about events that took place 20 years ago. Hardy cannot demonstrate that a different result is probable on retrial.

## B. JUDICIAL BIAS

Hardy argues that he was denied a fair trial because the judge was biased against him.

"The question whether judicial misconduct denied defendant a fair trial is a question of constitutional law that this Court reviews de novo." *People v Stevens*, 498 Mich 162, 168; 869 NW2d 233 (2015).

"A trial judge's conduct deprives a party of a fair trial if a trial judge's conduct pierces the veil of judicial impartiality." *Stevens*, 498 Mich at 170. "A judge's conduct pierces this veil and violates the constitutional guarantee of a fair trial when, considering the totality of the circumstances, it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party." *Id.* A reviewing court must evaluate the cumulative effect of errors in the context of a given case, which is a fact-specific analysis. *Id.* "In evaluating the totality of the circumstances, the reviewing court should inquire into a variety of factors, including the nature of

the judicial conduct, the tone and demeanor of the trial judge, the scope of the judicial conduct in the context of the length and complexity of the trial and issues therein, the extent to which the judge's conduct was directed at one side more than the other, and the presence of any curative instructions." *Stevens,* 498 Mich at 172.

Hardy first complains that the trial court belittled Register's attorney for being late on more than one occasion. We have thoroughly reviewed the record and found nothing about the trial court's behavior toward Register's attorney that would indicate that the trial court was prejudiced against Hardy. The trial court was perturbed by the delays and had every right to point out to the jury the cause of the delays. Hardy fails to explain how comments regarding Register's attorney adversely impacted his own case.

Hardy next complains that the trial court improperly told the jury that Sherita did not remember anything about that night when there was no factual basis for such a comment. However, when taken in context, it is clear that the trial court was referring to Sabo's explanation for why Sherita was not on the witness list. Sabo testified that Sherita "didn't have a whole lot of memory of the incident." When defense counsel pressed why more wasn't done to have Sherita testify, the trial court stated: "She's not, she's not here. She's not a witness. He talked to her, she didn't remember anything. Let's move on." Although Sabo didn't say that Sherita "didn't remember anything," he certainly said that she didn't have "a whole lot of memory" about that day 20 years ago. The trial court, in making that statement, echoed Sabo and was looking to prevent another exhaustive discussion about Sherita's absence from trial. Again, Hardy fails to demonstrate how the trial court actions pierced the veil of impartiality.

Finally, Hardy argues that the judge showed bias when he allowed the prosecutor to question Hardy about his criminal history. The trial court had previously ruled that much of Hardy's criminal history was inadmissible as impeachment evidence. This changed after Hardy testified. Hardy's testimony included the fact that he didn't do drugs and didn't like the smell of marijuana, so he went back into the bar while the victim and the others smoked. Then, while testifying that he paid the victim for sex, Hardy had trouble with the details because "it's very embarrassing." He added: "I feel very bad about the situation because I'm a Christian man and all and me speaking about this . . ." The trial court allowed the prosecutor to cross-examine Hardy on issues previously ruled inadmissible because Hardy "kicked open the door as far as I'm concerned to all of that" and "put his character at issue . . . . Stupidly really, but he did it. . . . And we're not bound by the, the ten year look back of [MRE] 609 because this isn't offered for impeachment. It's offered as to counter his own character evidence."

At the close of proofs, the trial court later instructed the jury:

[I]n the case of defendant Hardy, evidence was revealed on cross-examination that he has had brushes with the law in the past including a criminal conviction. This was introduced for the sole purpose of, um, detracting from Hardy's testimony that he would not have committed the crime charged because he is, in his own words, quote, a good Christian, close quote.

You must not consider this evidence for any other purposes. For example, you must not use the evidence that determine that defendant Register or Hardy is a bad person or that they are more likely to commit other crimes. You must not convict either defendant because you think he is guilty of some other bad contact.

-4-

Defense counsel did not object.

Again, given the context in this particular case, Hardy cannot demonstrate that the judge was biased against him. In fact, the trial court initially agreed that much of Hardy's criminal history was inadmissible. It was only after Hardy opened the door and brought his Christian character into play that the trial court allowed the prosecutor to delve into the previously inadmissible convictions. Hardy believes the trial court demonstrated "partisanship," but never argues that the evidence was improperly admitted. Considering the totality of the circumstances, it does not appear that the trial court's conduct pierced this veil of impartiality or violated the constitutional guarantee of a fair trial. It is not reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party.

## C. SENTENCING

Finally, Hardy argues that he is entitled to be resentenced based on accurate information. He claims that the guidelines were erroneously scored.

Because the crimes were committed before January 1, 1999, the former judicial sentencing guidelines apply, rather than the legislative sentencing guidelines. *People v Reynolds*, 240 Mich App 250, 253; 611 NW2d 316 (2000). An appellate court reviews a sentence imposed under the judicial guidelines for an abuse of discretion. *People v Milbourn,* 435 Mich 630, 636; 461 NW2d 1 (1990). "[A] given sentence can be said to constitute an abuse of discretion only if that sentence violates the principle of proportionality, which requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender." *Id.*

Hardy is not entitled to relief because "appellate review of habitual offender sentences using the sentencing guidelines is inappropriate." *People v Gatewood*, 450 Mich 1025; 546 NW2d 252 (1996). Instead, "review of an habitual offender sentence is limited to considering whether the sentence violates the principle of proportionality set forth in [*Milbourn*] without reference to the guidelines. *People v Gatewood (On Remand)*, 216 Mich App 559, 560; 550 NW2d 265 (1996). And, "if appellate consideration of the guidelines in such circumstances is 'inappropriate,' there concomitantly is no obligation upon the trial court to take the guidelines into consideration in its sentencing determinations for habitual offenders." *People v Haacke*, 217 Mich App 434, 437; 553 NW2d 15 (1996).

Hardy was convicted of two counts of CSC I as both a principle and an aider and abettor. He had an extensive criminal history. Other than his complaint that OV 12 was improperly scored, Hardy fails to argue that his sentence was disproportionate to the crime.

## III. DOCKET NO. 339630

## A. RIGHT TO CONFRONTATION

Register argues that his constitutional rights were violated when the prosecutor failed to present the serologist who performed initial testing on the victim's rape kit.

"Whether a defendant's Sixth Amendment right of confrontation has been violated is a question of constitutional law that this Court reviews de novo." *People v Bruner*, 501 Mich 220, 226; 912 NW2d

514 (2018). "De novo review means we review this issue independently, without any required deference to the courts below." *Id.*

"A defendant has the right to be confronted with the witnesses against him or her." *People v Chambers*, 277 Mich App 1, 10; 742 NW2d 610 (2007), citing US Const, Am VI, Const 1963, art 1, § 20, and *Crawford v Washington*, 541 US 36, 42; 124 S Ct 1354; 158 L Ed 2d 177 (2004).

> The Confrontation Clause prohibits the admission of all out-of-court testimonial statements unless the declarant was unavailable at trial and the defendant had a prior opportunity for cross-examination. A statement by a confidential informant to the authorities generally constitutes a testimonial statement. However, the Confrontation Clause does not bar the use of out-of-court testimonial statements for purposes other than establishing the truth of the matter asserted. Thus, a statement offered to show the effect of the out-of-court statement on the hearer does not violate the Confrontation Clause. Specifically, a statement offered to show why police officers acted as they did is not hearsay. [*Chambers*, 277 Mich App at 10-11 (citations omitted).]

"As a rule, if an out-of-court statement is testimonial in nature, it may not be introduced against the accused at trial unless the witness who made the statement is unavailable and the accused has had a prior opportunity to confront that witness." *Bullcoming v New Mexico*, 564 US 647, 657; 131 S Ct 2705, 2713; 180 L Ed 2d 610 (2011).

Register was not denied the right of confrontation under the *Bullcoming v New Mexico*, ___ US ___; 131 S Ct 2705; 180 L Ed 2d 610 (2011) and *Melendez-Diaz v Massachusetts*, 557 US 305; 129 S Ct 2527; 174 L Ed 2d 314 (2009) framework. Our Supreme Court succinctly discussed the two seminal cases as part of its discussion of confrontation clause jurisprudence in *People v Nunley*, 491 Mich 68; 821 NW2d 642 (2012):

> In *Melendez–Diaz,* the United States Supreme Court considered whether "certificates of analysis" were testimonial when they reported the results of a forensic analysis showing that material seized by the police and connected to the defendant was cocaine. The Court characterized the certificates as "quite plainly affidavits," which fall within the core class of testimonial statements and are defined as "declaration[s] of facts written down and sworn to by the declarant before an officer authorized to administer oaths" and "are incontrovertibly a solemn declaration or affirmation made for the purpose of establishing or proving some fact." Given that the fact at issue was whether the substance found in the defendant's possession was, as the prosecution claimed, cocaine, then this was the testimony that the analysts would have been expected to provide if called as witnesses at trial. The certificates were thus "functionally identical to live, in-court testimony, doing 'precisely what a witness does on direct examination.' "

> In addition, the Court reasoned that the certificates were "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," given that "under Massachusetts law the *sole purpose* of the [certificates] was to provide prima facie evidence of the composition, quality, and the net weight of the analyzed substance."[39] Further, "the analysts were aware of the [certificates'] evidentiary purpose, since that purpose—as

-6-

stated in the relevant state-law provision—was reprinted on the [certificates] themselves."

> In *Bullcoming v New Mexico,* the United States Supreme Court considered whether "the Confrontation Clause permits the prosecution to introduce a forensic laboratory report containing a testimonial certification—made for the purpose of proving a particular fact—through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification." The Court rejected the argument that the testimony of a "surrogate" expert was a constitutionally permissible substitute for the testimony of the analyst who had actually conducted the test. The Court also rejected the argument that the report was not testimonial, analogizing it to the certificates of analysis in *Melendez–Diaz* and pointing out that "formalities attending the 'report of blood alcohol analysis' are more than adequate to qualify [the analyst's] assertions as testimonial" and that "[t]he absence of notarization does not remove his certification from Confrontation Clause governance."[43] Further, Justice Ginsburg, joined by Justice Scalia, rejected the argument that this "unbending application of the Confrontation Clause ... would impose an undue burden on the prosecution," reiterating that the Confrontation Clause " 'may not [be] disregard[ed] at ... our convenience.' " [*Nunley*, 491 Mich at 700–702 (footnotes omitted).]

The case at bar is more on point with *Williams v Illinois*, 567 US 50; 132 S Ct 2221; 183 L Ed 2d 89 (2012), which the *Nunley* Court summarized:

> Most recently, the United States Supreme Court issued a plurality opinion in *Williams v Illinois* that addressed whether portions of the expert testimony from a forensic specialist violated the defendant's right of confrontation. Specifically, the expert witness testified that a DNA profile produced by an outside laboratory using semen from vaginal swabs from the victim matched a DNA profile produced by the state police lab using a sample of the defendant's blood. The defendant argued that any testimony from the expert implicating what had taken place at the outside laboratory violated the Confrontation Clause.

> The lead opinion concluded that the expert's testimony concerning the outside laboratory did not run afoul of the Confrontation Clause for two reasons. First, the out-of-court statements were related by the expert only for the purpose of explaining the assumptions on which the expert's opinion relied. They were not offered for the truth of the matter asserted. Second, even if the report that the outside laboratory produced had been admitted into evidence, it was not a testimonial document.

> With respect to the second reason, the lead opinion emphasized that the report "was not prepared for the primary purpose of accusing a targeted individual," which distinguished the report from the evidence at issue in *Crawford* and its progeny. Rather, the lead opinion reasoned that, viewed objectively, the primary purpose of the report was to catch the perpetrator who was still at large and that no one at the outside laboratory could have known that the DNA profile would implicate the defendant. Thus, the lead opinion viewed the report as "very different from the sort of extrajudicial statements,

such as affidavits, depositions, prior testimony, and confessions, that the Confrontation Clause was originally understood to reach."

In a concurring opinion, Justice Thomas disagreed with the lead opinion's two rationales. He nonetheless agreed that the challenged testimony did not violate the Confrontation Clause because the report "lacked the requisite 'formality and solemnity' to be considered 'testimonial' . . ." The dissenting opinion expressed agreement with Justice Thomas that the statements were offered for the truth of the matter asserted. The dissent, however, concluded that the out-of-court statements were indeed testimonial under *Melendez–Diaz* and *Bullcoming,* noting that although it is relevant to inquire whether the primary purpose of the statement was to establish "past events potentially relevant to later criminal prosecution," *Crawford* and its progeny do not suggest that "the statement must be meant to accuse a previously identified individual[.]" [*Nunley*, 491 Mich at 702–704 (footnotes omitted).]

Here, the prosecution called forensic scientist Kimberly Freeman to testify as to the contents of her *own* report. Freeman was a forensic scientist with Bode Technology from March 2009 to October 2015 and was part of a team that worked on a large quantity of sexual assault kits from the City of Detroit. The kits arrived via Fed Ex or UPS. As part of that report and analysis, Freeman was required to look at all of the work that was done prior to receiving a kit. She would conduct a "mini technical review" on the case filed to make sure that everything was done correctly and that testing was appropriate. The rape kit included vaginal swabs, rectal swabs, oral swabs, pulled head and pubic hairs, and a blood sample from the victim.

Freeman explained that forensic serology involved screening items of evidence for the presence of blood or semen. "Y screening" is a method of detecting specifically for male DNA. Because she was not trained in serology at Bode, Freeman did not write the portion of the report. She did not know who performed the actual Y screening. However, she was trained in "Y screening" and was able to review the results from the "Y screening" as well as write the result in her own report. Male DNA was indicated in the vaginal and rectal swabs. DNA from the vaginal swab indicated two foreign individuals, including at least one male contributor.

After viewing all of the data and information that was generated, Freeman prepared her own report. She explained that another separate agency was tasked with processing suspect samples. Therefore, Freeman was never asked to draw any conclusion as to whose DNA was involved because she did not have samples from other individuals to compare. Instead, her report was sent to the submitting agency so that it could proceed.

Forensic scientist Kirk Deleeuw testified that four records were generated from the rape kit. The first three were authored by Sarah Tibault ("Tibault") and Deleeuw authored the fourth. The first report was a review of the outsource data from Bode Technology. The unidentified profiles were put into a data base and the second report was the result of a search from that data base. The third report identified an individual in the data base. The fourth report were buccal samples from Hardy and Register. Deleeuw testified that Register was the major donor from the vaginal swab and that Hardy was the minor donor for the vaginal swab. The data collected from the rectal swab was insufficient for comparison purposes.

Tibault testified that the data that Bode produced and the reports generated were turned over to the Michigan State Police for review and entry into a data base. Tibault's job was to identify DNA profiles and then enter those profiles into a data base. Tibault didn't touch any of the actual physical evidence; all of the information that she reviewed was electronic. Tibault reviewed the work done by Freeman and generated a report as a result of that review. She took the DNA profiles from the vaginal swabs and also entered DNA profiles associated with two individuals into the data base. Once an association is found, a scientist reviews that association to see if the two profiles match. There was one "hit" on the major donor. An association was also made as to the minor donor. Tibault then requested samples from the donors to confirm.

The foregoing evidence demonstrates that the serologist's report: (1) explained the assumptions upon which subsequent scientists relied; (2) was not prepared with a targeted individual in mind; and (3) did not contain the formality or solemnity to be considered testimonial. As such, Register's confrontation rights were not violated.

## B. EVIDENCE OF THE VICTIM'S CHARACTER

Register argues that evidence of the victim's lifestyle was probative of whether the sexual activity was consensual and that the trial court abused its discretion when it denied Register the opportunity to fully cross-examine the victim.

Register complains that the trial court abused its discretion when it ruled that such evidence was inadmissible, but Register's brief and argument fail to acknowledge that such evidence *was* admitted during the victim's mother's testimony. During direct examination, the mother described the victim as a "typical teenager." The trial court ruled that such testimony had opened the door for defense counsel to cross-examine the mother "about the veracity of her statement that this rape materially altered her kid's attitude towards life."

The mother described the victim as a "typical teenager" before the rape. The mother then had to explain that a typical 17-year-old would hang out in a bar, smoke marijuana, drink alcohol, have a child, and live with a man. The mother testified that being pregnant at 16 was "normal" for the victim. The mother did not know Brian and did not know that the victim once lived with him. The mother just remembered a period of time when the victim "had been gone." This was not unusual because the victim, who had issues with her siblings, would often run away. The victim did not have a high school diploma.

The jury heard the exact evidence Register wanted it to hear regarding the victim's character and, consequently, there can be no claim of error.

## C. *BATSON* CHALLENGES

Register argues that he was denied his constitutional right to a fair and impartial jury when the prosecutor removed two black jurors in a way that would exclude qualified black jurors in violation of *Batson v Kentucky,* 476 US 79; 106 S Ct 1712; 90 L Ed 2d 69 (1986).

Our Supreme Court explained the proper standard of review in such cases in *People v Knight*, 473 Mich 324, 327; 701 NW2d 715 (2005):

The proper standard of review depends on which *Batson* step is before us. If the first step is at issue (whether the opponent of the challenge has satisfied his burden of demonstrating a prima facie case of discrimination), we review the trial court's underlying factual findings for clear error, and we review questions of law de novo. If *Batson*'s second step is implicated (whether the proponent of the peremptory challenge articulates a race-neutral explanation as a matter of law), we review the proffered explanation de novo. Finally, if the third step is at issue (the trial court's determinations whether the race-neutral explanation is a pretext and whether the opponent of the challenge has proved purposeful discrimination), we review the trial court's ruling for clear error. [*People v Knight*, 473 Mich 324, 345; 701 NW2d 715 (2005).]

Prospective Juror Cynthia Lowe had the following exchange with the court during voir dire:

*Juror No. 14*: I have a nephew who is currently in prison for rape and sexual assault.

*The Court*: How long ago was that[?]

*Juror No. 14:* January he stays in prison most of the time and when he was let out on probation he did this. So they put him back after his probation because he committed this crime.

*The Court:* Yeah, he's a frequent flyer.

*Juror No. 14:* A habitual.

*The Court:* Is that going to have any affect [sic] on your ability to be fair[?]

*Juror No. 14:* No.

She was also on a sexual assault jury in 1975. The prosecutor exercised a peremptory challenge to Lowe.

Next was Prospective Juror Amy Ballard. Ballard told the court "my son was convicted of sexual assault and he spent eight years in prison." This occurred some 15 years ago. Ballard did not know anything about the evidence or the incident giving rise to the conviction. She did not have an opinion about whether her son was treated fairly or harshly enough. Her son was now "a productive citizen he's working and he's married and he has a family." Ballard denied that his conviction would interfere with her ability to be a fair juror. Ballard was on a jury 20 years ago. The prosecutor exercised a peremptory challenge to Ballard.

Register's attorney objected and the following exchange took place:

*The Court:* You know those were two black females that sounded to me like very good prosecution jurors especially Lowe who blew off her own nephew's rape conviction.

And um you know you're going to have to explain Lowe. I wondered about Lowe. And I wonder why would you have excused her? But of course it's not my problem.

But I think you need to explain a race neutral reason is the complainant white.

[*The prosecutor*]: Yes.

*The Court:* . . .Give me a race neutral reason for Lowe and Ballard. Lowe's nephew was convicted of criminal sexual assault.

[*The prosecutor*]: And [Ballard's] son was convicted for sexual assault. That is my reason. I think that even if they may not think at this point it is going to impair their bias those are people very close to them in their life.

And the likelihood that it will come out and affect them during the trial I think is a huge consequence.

*The Court:* In Lowe's case you know yes sounds to me like it may have a threat her [sic] in a way it may not be favorable to you.

You do remember that she said um, he's a frequent flyer. I . . .frankly would have been more expected one of the defense lawyers to excuse her.

The prosecutor also noted that Hardy's attorney had exercised all six of her peremptory challenges to excuse white jurors. After talking about another juror who was excused for sleeping, the trial court added:

Well, I don't think that there is anything more to be said about it. I mean . . .I don't know what to say about a person here Mr. Price because frankly the last two jurors in seat 14 indeed are African American women and they struck me as being prosecution oriented witnesses unless they were just trying to bluff me.

[*Defense Counsel*]: That's our position. Our position is that makes her logic suspect in terms of who she's eliminating that's the only reason we wanted to approach and the Court has indulged us in the past and we have no reason.

*The Court:* No more approaches.

[*Defense Counsel*]: That was it.

*The Court:* Well, I'm not convinced that there's any action for me to take at this point. Ms. Ballard has been excused and we'll let her go.

"Under the Equal Protection Clause of the Fourteenth Amendment, a party may not exercise a peremptory challenge to remove a prospective juror solely on the basis of the person's race." *Knight*, 473 Mich at 335 Under *Batson's* three-part test, defendant must first make a prima facie showing of discrimination, meaning that defendant is a member of a cognizable racial group and that the prosecutor

-11-

has used a challenge to exclude a member of that group, raising an inference that the challenge was used on the basis of race. *Knight*, 473 Mich at 336. Next, the burden shifts to the prosecutor to articular a race-neutral and non-discriminatory reason for the challenge. The reason need only be facially valid, meaning something other than race. *Id.* at 337. Finally, the trial court must determine whether the explanation is a mere pretext for discrimination. *Id.* at 337-338.

Here, the third part of the test is at issue. There is no dispute that Register is a member of a distinctive group, that the prosecution used peremptory challenges to exclude two prospective jurors of the same group, and that the prosecution offered a race-neutral and non-discriminatory reason for the challenges. At issue is whether the trial court clearly erred in accepting the stated reason and, as Register argues, failed to appreciate that it was mere pretext for the prosecution's ultimate goal to exclude black jurors. The trial court did not err, given the jurors' relationships to individuals who had been convicted of criminal sexual conduct. See *People v Eccles*, 260 Mich App 379, 386; 677 NW2d 76 (2004) ("The prosecutor explained that a son of that proposed juror had previously been prosecuted and convicted by his office."); see also *People v Howard*, 226 Mich App 528, 535; 575 NW2d 16 (1997) (". . .the record reveals that the juror was dismissed primarily because he had an uncle with whom he was close who had been tried for murder, a race-neutral reason.") That the jurors may have expressed the ability to be fair and impartial is not dispositive under the *Batson* rule. Nor is the trial court's gratuitous observation about the strategy involved. Register was not denied his constitutional right to a fair and impartial jury where the prosecutor exercised two peremptory challenges to exclude potential jurors who had family members that were involved in the criminal justice system.

## D. SENTENCING

Register argues that the trial court erred in scoring numerous offense variables.

### 1. OV-2

Register argues that the trial court erred in scoring OV 2 at 25 points for bodily injury because personal injury was not an inherent part of the jury's verdict.

Under the previous judicial guidelines, a defendant was scored 25 points for OV 2 if the victim suffered bodily injury or was subjected to terrorism. *People v Dilling*, 222 Mich App 44, 55; 564 NW2d 56 (1997). The parties agreed that terrorism was not at issue. As for "bodily injury," the trial court properly determined that bodily injury was inherent in the jury's verdict of CSC I because the jury was given multiple theories to convict, including that the victim suffered bodily injury. Register's focus on force and coercion is irrelevant.

### 2. OV-5

Register argues that the trial court erred in scoring OV 5 at 15 points because the jury did not believe that the victim was held captive because it found Register not guilty as to Count III.

Under the previous judicial guidelines, a defendant was scored 15 points for OV 5 if the "[v]ictim was moved to another place of greater danger or to a situation of greater danger, or was held captive significantly beyond that which was necessary to commit the offense." *People v Piotrowski*, 211 Mich App 527, 529; 536 NW2d 293 (1995). The victim testified that when she told defendants that she was going back into the bar to check on her friend defendants immediately drove away. She also

testified that she later jumped out of the car and ran away, only to be dragged back by both defendants. On appeal, Register makes the confusing argument that he was acquitted of the aggravating circumstance of kidnapping. In reality, both defendants were acquitted of Count III, which involved anal penetration. Therefore, Register's acquittal of Count III does nothing to prevent scoring for moving the victim to a place of greater danger.

### 3. OV-12

Finally, Register argues that the trial court erred in scoring OV 12 at 25 points for acts committed by his codefendant.

Under the previous judicial guidelines, a defendant was scored 25 points for OV 12 for one criminal sexual penetration apart from the one penetration that formed the basis of his CSC conviction. Therefore, the one penetration that forms the basis of the conviction cannot be scored. Register cites no case law in support of his claim that scoring penetrations of his codefendant violates the principle of proportionality.

### E. EFFECTIVE ASSISTANCE OF COUNSEL

Register has filed an Administrative Order 2004-6, "Standard 4" brief, ostensibly arguing that trial counsel was ineffective. We are unable to discern Register's argument. He seems to argue that Michigan's criminal statutes were not properly implemented and that counsel was ineffective for failing to raise jurisdictional issues. We decline to address this incomprehensible argument, which is raised for the first time on appeal, because it fails to raise any appreciate legal issue. *People v Harris*, 261 Mich App 44, 50; 680 NW2d 17 (2004).

Affirmed.

/s/ Douglas B. Shapiro
/s/ Mark J. Cavanagh
/s/ Kirsten Frank Kelly